This is case number 4-24-0615, Megan Ulmer v. Cynthia Campbell. Counsel, could we have appearances first for the appellant? Hi, I'm just from our seat, sir. Just from your seat is fine. Andrew Chamberlain on behalf of the appellant. All right, thank you. Hi, I'm Amber on behalf of the appellant. All right, thank you. Sir, you may begin with your argument. Good afternoon, Your Honors. Just to reiterate, my name is Andrew Mertzenich. I am counsel for the appellant in this matter, Megan Ulmer, who, as this case has proceeded, is now married and has a few children. You may meet some of them behind me. Her name is now Megan Scott. This case concerns the appellant's claim to title of disputed property in Winnebago County through adverse possession under Illinois law. The appellant respectfully submits that the trial court erred in its findings, as the evidence clearly and unequivocally demonstrates that the appellant and her predecessors in title satisfied all elements of adverse possession for the statutory period of 20 years. Your Honors, if I may take you on a trip down to first-year law school, we're going back to property class. Under Illinois law, a party claiming title by adverse possession must establish possession of property for that statutory period defined by statute. In Illinois, that is 20 years. Such possession must be continuous, hostile or adverse, actual, open, notorious, and exclusive, and under claim of title inconsistent with that of the true owner. And the burden of proof is upon the claimant to establish each of these elements by clear and unequivocal evidence. Furthermore, all presumptions are in favor of the title holder and permissive use cannot write them into adverse possession. Let's start taking those elements apart a little bit. Continuous, actual, and open. The appellant and her predecessors in title continuously exercise dominion and control over the disputed property for more than 20 years. Acts of dominion show actual possession. That includes maintaining property, as the cases we've cited show. In this case, it involves re-graveling and plowing snow, employing even the owner of record to help maintain that. It includes erecting gates, excluding others physically. These acts alone are sufficient to constitute actual possession as they provide visible evidence of the appellant's exercise of dominion and control over this property. Illinois courts have also held that improvements made show actual possession. The improvements include the maintenance, but also include erecting gates and such. And this indicates to persons residing in the immediate neighborhood who has the management and control of the land, and this satisfies actual possession. The appellee's argument that the appellant's possession was not exclusive because others occasionally use the land is misguided. It does not meet the legal standard. Exclusive possession does not mean that no one else is allowed to set foot on the land. I do not have to fence it off and patrol it with guards. Rather, it only requires that the true owner be altogether deprived during that statutory period. That just means possession. I am in control. The appellant's actions, including erection of a gate, maintenance of the driveway, they demonstrate that intent to exclude others. But the actual exclusion is not necessary, only the intent. Moving on to hostile or adverse. To satisfy the hostile or adverse element, the appellant need not demonstrate ill will toward the true owner, but must show an assertion of ownership that is incompatible with any other claim of title. Putting that into layman's terms for this case, the appellant's actions include maintaining the driveway, exclusion of others, and these are consistent with what the true owner would do. As I was preparing to brief in this case, Your Honors, and as I was doing this case, I've had it pretty much since the beginning, I've learned that adverse possession is not as black and white as we say in law school. It's enigmatic, where everything overlaps with each other. You'll see me going back to the same statement of facts, which is there was control, there was dominion, there were acts of improvement to show that each of these elements is satisfied because they all are commingled. And the appellee's contention, though, that the appellant's use of the property was permissive, that's unsupportive. And that's where the key of this is, Your Honors, because at the trial court, it was found that the land's use was permissive. And if it is permissive, then it cannot ripen into a claim for adverse possession. Counsel, if I may interrupt you there for a moment, and please feel free to mark your place in the argument, but kind of along the lines of permissive, but not necessarily directly on point, I do want to talk a little bit about the deeds that are contained within the record. Yes, Your Honor. So I'm referencing what I believe you've indicated as Supplement Exhibit 45, but in particular, it is the Faulkner deed to what I will say are the sword heirs, if you will. And within that document, in what I will say the initial statement, it indicates that parcel one is designated as the formal railroad area, if you will. And I guess I want to talk a little bit about the easements that are contained within that document and then also the warranty deed by which Ms. Ulmer now stops, I believe you've indicated, took title from those predecessors in title. So there seemed to be a reference in the record that that initial grant of easement for ingress and egress did not reference the area that we're talking about in question or perhaps only referenced a part of it. So if you could help me with a better understanding, is that deed from the Faulkners only addressing what I will say the prior railroad strip that was owned?  So if I can kind of draw on the air, Your Honor. So I'm going to flip the property upside down just so that way I can start at the top. So for reference points, start with where you would deem Moody Road to be. Moody Road will be at the top, Your Honor. We come down the driveway. There is the Childer's property that would be on the right, the Childer's property. You enter the driveway. It is a gravel road. And then you reach the end of the driveway. There is a little gap there, which is the old railroad that used to go. Which was owned by the railroad. Owned by the railroad. Outright. Outright. It was ripped up. There's no tracks there now. And then after that is the remaining sliver that goes down to my client's property. This easement follows along the driveway. It doesn't, like, contain the driveway, but it starts right at the width of the driveway. So what it is, it's assuming that the driveway is the access point. And then you cross through that easement, and then you're on to my client's property. And when you're talking about that easement runs that way, you're talking about easement that was granted to Ms. Ulmer at the time that she purchased the property. Correct. Or are you talking about what was granted within the Faulkner deed? I believe that would have been the one that would have, I would have to double check, Your Honor. I believe that's the one that would have been granted in the Faulkner deed. Because it's always, there was no brand new easement from what I'm aware across the railroad. And I guess that's where I require some clarity here. Because within the Faulkner deed, it suggests at least as to parcel one, that it is conveying, if you will, that area that was the former Chicago-Milwaukee-St. Paul and Pacific Railroad Company's railroad right-of-way. And so my question is, is it that strip that is running laterally across, if you will, or is it? It's across laterally. So when you talk about running along the driveway, though, that is a separate easement. Yes. Thank you. And I do, Your Honor, if I had, just looking back at the record, or recalling the record, there is no easement that runs over the driveway. What it is, is it's a flagpole lots. A little bit of history back when. What was that term? Flagpole lots. Thank you. Yeah, just the flagpole. Self-explanatory on that one. But now I understand the easement, despite the fact that it was conveyed to Ms. Elmer, or now Stotts, in the deed, perhaps unbeknownst to her, did not include the actual driveway area. That is correct, Your Honor. Would you like me to continue where I left off, Your Honor? Yes. So, Your Honor, we're returning now to these elements of adverse possession. And I had just said, previous to our small conversation with Justice, forgive me, Leonard, is it? Leonard, yes. Forgive me, I did not know who my panel was, though. But the trial court's finding that that use was permissive is against the manifest way of the evidence. And the one thing that I'm going to point to, Your Honor, even if there was the permissive use, the neighborhood agreed that there was permission, the minute you dig a trench to put a gas line in, I don't know where anybody could say, I could just go out to, we're on Monroe Avenue, we're all permitted to use that, skip the government laying of the land and everything, but I can just dig a trench and that's permissive. That's those acts of dominion that I've been talking about. Laying a gas line in 1997, 1992, it's in my brief, Your Honor, those are the acts of dominion that show that there was actual possession. And there was no evidence of permission. Permission is something that is affirmatively granted. It is something where I would give it to you. You have permission to use the driveway. You have permission to run a gas line. But that's not the case here. There's no evidence whatsoever that that was a permissive use. And I would also direct the court to the testimony of Mr. Joe Childers, who has lived at the foot of the driveway for generations, literally, and he was the one who laid that gas line. So we have affirmative evidence. It's not just we took a metal detector and gas. He was the one who actually laid the line, or I should say dug the trench and then that court came and laid the line. If that permission to do that were to be inferred from this, this would effectively do away with any future claim of adverse possession because basically anything's done with permission if the neighborhood's been doing certain things. And that would upend ages of precedent and should not be the case and is not the case with this set of facts. The trial court also erred in finding that the appellant failed to establish exclusive possession. The evidence demonstrates that the appellant and her predecessors actively did exclude others from the property. Some of the testimony of Wayne Schmidt in 2008 on the weekend of Easter confronted the predecessor entitled for the appellee and removed them from the driveway. That's not the beginning of a statutory period. That's the continuation of a statutory period. Furthermore, the appellant's placement of a gate in 2017 is the same thing. It's not the beginning of the statutory period. It's the continuation of the statutory period. And that's where I'm getting at is the findings of the trial court do not match the evidence that was presented. It's against the manifest weight. And that speaks to the heart of this case. And that's why we are respectfully requesting that the court reverse the judgment of the trial court and rename the case with instructions to enter judgment in favor of the appellant. In the alternative, we are asking that the matter be remanded for further proceedings consistent with the court's opinion. These are not the only issues, though. This is just the main issue of which I thought that you may have questions about. There were two other issues that we raised in our brief. The first was a motion to strike testimony, and the second one was regarding a request for a site visit. I'm going to start with the motion to strike. The appellant moved the court to strike the testimony of William Faulkner, who was a rebuttal witness for the defense. And the reason for that was because of a violation of the exclusion order that was made by the appellee or appellee's counsel right before trial in which the witness was present. Your Honors, I would refer you to the record because there are affidavits that were attached to that motion which tell the story of that. I can tell you I was there, and the affidavit was— There appeared to be a discrepancy as to whether the parties agreed or disagreed as to whether his testimony was consistent with his deposition testimony. Was the deposition made a part of the record on appeal? It was not, Your Honor. If Your Honors would like to order it, I'm happy to supply it. I would have to order it and all that, but I would be happy to supply it if you would grant leave to do that. But, Your Honors, I would argue that whatever the content of that testimony wouldn't matter. And the reason I say that is because this is an individual who heard the motion of the court, and it was not my client's fault that they remained in the courtroom. And— Well, counsel, if I may, you suggested it wouldn't matter as to what the deposition said, but wouldn't that go a long way to establishing whether or not you could show that your client was prejudiced by allowing that testimony to occur? Your Honor, when it comes to having that before the court, it never even made it into the trial court's record, and that's why we are seeking the remand on that matter in particular. So that way the trial court would be able to assess that. When it comes to purposes of this appeal, Your Honor, what I'm saying is that we didn't even get that far. There was the—I forget the word for casual conversation between counsel with the judge regarding the nature of the motion and the nature of the testimony, but we never even got to introduce the deposition. The trial court just said it was untimely for that motion to happen, which does bring me to my next point, Your Honor, is that this was an abuse of discretion because our— we never had a chance to talk to the judge about the substance. And even more, the untimeliness issue, the motion was timely. It was made before closing arguments, yes, after the close of proofs, but before closing arguments and as close to the time when it could be decided as possible. And, Your Honor, as I was referring to those affidavits, just from my own personal experience, I didn't know that the witness was still in the courtroom until after the trial had concluded and I finally had a chance to speak to my clients. Immediately, within a couple days, we filed that motion. We noticed it up to get it up because that was the soonest that we had the possibility to do it. Excuse me. And when it comes to the issue of prejudice, which we do have to—I will address briefly, Your Honor. The trial court's reliance on that witness's testimony, Mr. Faulkner's testimony, and its judgment demonstrate that the testimony was material to the outcome of the case. And Illinois courts have held that the burden is on the party seeking reversal to establish prejudice that affected the outcome of the trial. And we've met that burden by showing that we didn't even have a chance to dispute it. The motion was completely done away with without any consideration of the merits of that motion. Moreover, the trial court failed to consider whether the violation of the exclusion order was the appellant's fault. Illinois law is clear that a party should not be penalized for a witness's violation of an exclusion order if the party was not at fault. And the appellant has no control over Faulkner's presence in the courtroom. It was a defendant's witness, and we should not be prejudiced for the violation of that order. The second issue that we bring up in our brief is the site visit. The trial court's denial of our request for a site visit is an abuse of discretion as well. And that's because the physical characteristics of the property are central to this claim. There was introduced evidence of a fence that had been run down, that had been accessed. We asked for the trial court to come and see that very fence. And our adverse possession claim requires that proof of exclusivity. Is the land used consistent with what the testimony says? But, counsel, didn't both parties agree that multiple years had passed, that the condition of the property could have changed? It could have, Your Honor, but that's for the trial court. That was both attorneys, correct? I believe so, Your Honor, yes. And so I guess, you know, the standard we have for you is how is the court's decision then, you know, arbitrary, fanciful, or unreasonable? And I guess I'll have you address that because it seems to me, given that information and the suggestion by both parties, I don't see how it fits into that category. Sure. So, Your Honor, we can acknowledge that a lot, that years have passed. But that doesn't mean that it's immaterial. Seeing the land, seeing how it's the lay land, looking at that easement, where it runs, all of that, is central to the case. Just because we acknowledge, yes, years passed, it may have changed, but how that fits into the trier of fact, their perception, that's what's more material. They decide what is actually important for them to know. And acknowledging, yes, years have passed, but I can see that this gravel driveway has ditches and holes and stuff like that that we can't show through testimony. Counsel, can you point to a case where it was held to be an abuse of discretion for the trial court to deny a motion for a site visit? I cannot, Your Honor. In my research, I did not find one. I did not find one that looked at the opposite. If Your Honors would like more information, I'm happy to file a supplemental brief. Well, I think that is, you've had your opportunity to present that authority, and I just wanted to confirm, there is no case authority that you're aware of? Not that I'm aware of, Your Honor. All right, thank you. Finally, Your Honors, just a couple closing points here. The fact is that what happens with adverse possession is that it's meant to keep a status quo. It's meant to say, this is how things have been, and we are just recognizing that, yes, you have made a claim for adverse possession. You are now the owner of record because you have made productive use of property. That's the social standard for why we allow it to be on the books. The facts of this case show that adverse possession is there. The trial court, in finding against the appellant, has completely blown up what has been done for the last 50-plus years. This driveway has always been used to access the appellants and their predecessors entitled their property. By finding in favor of the defendant, my clients would have to build a brand-new driveway at huge expense, even though they've used this one for many years. So if this court were to affirm the trial court's judgment, that's a lot of money for my clients when they have shown the actual ownership for possession. Well, counsel, I guess I will pause there for just one moment because it does appear to me, based on the complaint, that there was no request, there was only a request for adverse possession, not for an easement, if you will, by necessity or by... Correct, guys. Looking at the elements of easement by necessity, my clients aren't landlocked. Again, they are on Flagpole Lot. It just runs next to, it's actually in a ditch next to this driveway. So we wouldn't have that. As for a claim of, I forget what easement, you know what I'm talking about, Your Honor, over the driveway, Your Honor, that was strategy. We decided not to include it in our complaint. And it also seemed to me that there at least was some discussion that was contained within the record that perhaps a discussion of having an easement was offered by the defendant. Is that correct? I don't know if it was offered, Your Honor. And again, this is thinking about a few years. It was explored, but there's... I cannot bring up settlement discussions, Your Honor, before Your Honor. Thank you. Your Honor. Counsel, you are out of time. You'll have time in rebuttal. Thank you, Your Honor. All right, thank you. Ms. Kaper, you may proceed with your argument. Thank you, Your Honor. May it please the Court and good afternoon, Counsel. Eileen Kaper on behalf of the appellee, Cynthia Campbell. As counsel outlined in his argument, this matter comes before the Court on an appeal of an order by the circuit court for the 17th Judicial Circuit finding the appellant, Ms. Ulmer, failed to prove the required elements of adverse possession regarding the appellee's property. In issuing her rulings after a bench trial on the merits and after reviewing and ruling on Ms. Ulmer's motion to reconsider, Judge Fabiano correctly decided that Ms. Ulmer could not meet her high burden to prove by clear and convincing evidence that the possession of the land at issue was hostile and adverse, that her possession to the land was exclusive, and that she possessed the land in this manner for more than 20 years. The law is well established that to take away another's exclusive property rights through adverse possession is and should be very difficult, and this is a very high evidentiary bar that Ms. Ulmer just simply cannot meet. At this stage, in fact, Ms. Ulmer must meet not just one, but two very high thresholds. First, in the trial court, Ms. Ulmer had to demonstrate by clear and convincing evidence every single element of adverse possession, and then also here at appeal, Ms. Ulmer now has another high hurdle to show that Judge Fabiano's ruling in favor of Ms. Campbell was against the manifest weight of the evidence. This means that this court must find that Judge Fabiano's ruling was unreasonable or arbitrary or not based on the evidence, which it certainly was not. If the court, unless the court would prefer otherwise, I'll begin with counsel's first argument regarding Judge Fabiano's decision that Ms. Ulmer had not demonstrated the requisite elements of adverse possession. As set forth by this court in Storr v. Seville, 20-23-4-220-751, acts of proprietorship must give the true owner fair notice, fair notice, under the circumstances, under the circumstances, that the complainant asserts a fee simple interest, a fee simple interest in the disputed property. Each one of those factors in the decision Storr sets out for us, the rule of law there, is essential to this case. What counsel neglected in his argument was to go back to the oldest memory of how this driveway evolved, and that is that three neighbors shared the driveway, and they did so for quite some time, at least over a decade, and arguably for four decades. In doing so, the Faulkners, who were the predecessors to Ms. Campbell, the Sorgs, who were the predecessors to Ms. Ulmer, and the Childers, who also lived near the property and needed to use the driveway for access, shared the driveway. The testimony of William Faulkner was that these three families shared the driveway on a regular basis. The Faulkners accessed the driveway to get to their fields. They entered through a gate on the Childers' property. Joseph Childers testified to that. William Faulkner further discussed the friendly nature between the neighbors. He testified that he and his friends, when he was in high school or college age, would go out and party in McCloster's field, which was the predecessors to the Sorgs, who were the predecessors to Ms. Ulmer. Counsel neglected to highlight the evidence that Judge Fabiano relied on were that these were neighbors. They shared this driveway. They all used it. The use was permissive. The Faulkners allowed the Childers to get to their house. They allowed the Sorgs to get to their home. William Faulkner, who was familiar, both lived on the property and lived in a neighboring property for almost his entire lifetime, testified that the use was permissive. He and his family had always believed that the other two families had a permissive right to cross the land to get to their homes and that that right was never taken away from the neighbors who needed to do that. It was a neighborly gesture to allow them to use the properties that they owned and to get to the properties they owned. The burden here is on Ms. Ulmer. It's her burden to show that her use of the property was both exclusive and hostile and adverse. So let's take exclusive first because I think that's the easiest one to dispense of first. It was not exclusive. She had two other property owners using the driveway with her. This was well-established. And Mr. Faulkner testified that, in fact, the Faulkners, his father who owned the property prior to Ms. Campbell and Mr. Schmidt, that they had used that driveway for quite some time to haul out hay bales and that they also at times had used that property to enter with machinery and that he entered the property to clear it off after his father passed away and when they were selling the property. He testified that there was fairly regular use of the driveway that he used to get from his new property to his parents' property and that he used the driveway for that. So Judge Fabiano's decision is not arbitrary. It's not unreasonable. There was evidence in the record that, in fact, there was a neighborly relationship between the parties that established this permissive use and that the Faulkners had used that driveway on an ongoing basis throughout the time period at issue. Also, there was evidence from testimony of Joseph Childers as well as Ms. Ulmer and Ms. Campbell that the Childers used the driveway on a regular basis. So therefore, we also lack exclusivity there. Now, counsel argued that exclusivity doesn't mean that you have to exclude everyone from your property. And of course not. It doesn't mean that you have to exclude everyone from your property. But what exclusivity means is you have to exclude the true owner from the property and that you have to do so in a way that the true owner is put on notice, fair notice, under the circumstances that you are claiming a fee-simple interest in the property. Now, if three property owners shared a driveway for a decade and all of a sudden one of them decided that it was only their driveway, then certainly that person would have to exert that right in some way or notify the other parties to just simply say that that plaintiff did not have to show anything and could just continue to use the driveway as she had and as her predecessors had without giving fair notice in any way to the defendant, Ms. Campbell, or her predecessors, simply does not provide the fair notice required in store. Counsel, if I may interrupt you just for a moment. If you can, considering the notice element and that the couch that, if you will, in terms of when we talk about the gas line and putting the gas line in, because Counsel has given us the example of going outside and putting a gas line outside. So address, if you will, some of these issues, particularly with the gas line. So let's talk about the gas line, the much-discussed gas line. It was installed by Herman Soar, the predecessor to Ms. Ulmer, and Joseph Childers in 1992. However, as Soar teaches, there must be fair notice, and there was no testimony at trial as to what was entailed in installing this gas line. Now, Counsel says, it was a gas line installation, so everyone must have known it was happening. A gas line is underground. Granted, you need to dig a trench for the gas line, but there was no testimony as to how long did that take? What was on the property that would have indicated to the Faulkners at that time that a gas line was being put in? What kind of machinery was used to put the gas line in? Did these guys just go out with a shovel and dig a trench? Or were there trucks? Were there other things? The fact is, once that gas line is underground, it no longer provides fair notice. So what Plaintiff is hanging her hat on is the building of the trench, and there's just nothing in the record that supports Counsel's assertion that this would have been clear notice to the Faulkners that the land was being used in a way that would exert a fee-simple interest. Frankly, it's akin to saying if I share a driveway with my neighbor and they go out at night and bury treasure under the driveway, then in 20 years they can claim adverse possession because they buried something under the driveway. The sole fact that it's buried indicates that it is not a notification of an improvement on the property. Does it matter whether or not whatever has been done to the driveway serves as an impediment to someone else's travel over the driveway? Like putting a gate up. Here we're talking about burying a gas line. Just for that period of time that construction is undergoing or being done, it doesn't seem like travel on the driveway is being restricted in any way. Is that right? Correct. To my knowledge, there was no testimony at trial. There wasn't much testimony at all as to the intricacies of the gas line installation. But I do not recall any evidence as to whether it obstructed the driveway or whether the driveway was unusable during that period of time. I would also like to call the court's attention to the facts in store. In that case, we have a landlord-tenant relationship. But I think this is an interesting corollary. In that case, what the court said is if the tenant exceeded the leasehold by a sliver of land and built his driveway too big outside of his leasehold, that the landlord couldn't possibly be on the hook for knowing that the leaseholder had exceeded the bounds of the lease. Because it's right next to the driveway, right next to the area that you have leased them, that you can't hold the owner responsible. That's not fair notice. If they just exceeded the amount of the leasehold by a sliver in building their driveway, there's no way that the landlord would have known that. I think the facts here are comparable in that if you put something under the driveway, it's not necessary that the property owner may not actually know that you did anything to the land. And therefore, that is not fair notice. In addition, Judge Fabiano made the correct decision as to the element of hostility. Hostility is an assertion of ownership incompatible with that of the true owner and all others. And the fact is that these three neighbors shared this driveway. So in order for Ms. Ulmer or her predecessors to show that she was hostile to the property rights of the Faulkners, in some way she would have had to notify them that they could no longer use that driveway. And the fact is that just didn't happen. And the other fact is the burden is on the plaintiff here. It is a very high standard to take someone's legal property away that they've paid taxes on and that they have held for years without notifying them that this kind, friendly relationship we've had and that your predecessors have had is now something very different that you need to look at in a nefarious manner. I'd like to touch on the evidentiary issues, if that's okay with the court, briefly. In regard to the exclusion of witnesses, the discussion of the deposition testimony is on the reported proceedings R168 and 169. And in that discussion, Judge Fabiano raised several issues. Waiver was one of them, but not all of them. She also pointed out that at that point when it was raised, the court had no ability to question Mr. Faulkner about what he had heard or how long he was in the courtroom. In addition, the defendant was unable to call one of its other witnesses because it believed Mr. Faulkner had covered all the ground it needed to and it dismissed its additional witness that was there to testify. Judge Fabiano was concerned about these elements of these facts, and so she asked about prejudice. They weighed into that. If you look at R168 and R169, the defendant's counsel argued that if Mr. Faulkner's testimony was stricken, then he would try to admit the deposition testimony of Mr. Faulkner because it was exactly the same. Plaintiff's counsel at that point acknowledged that most of it was the same. Judge Fabiano asked him to identify where it differed, and he said Mr. Faulkner may have said in his deposition that he was on the property a less number of times than what he actually testified. What I want you to consider here, too, is when we talk about prejudice and was there prejudice in allowing that witness's testimony to stand, we are not talking about the prejudice of Mr. Faulkner's whole testimony. We are talking about the prejudice of Mr. Faulkner listening to the witnesses before him. If Mr. Faulkner's testimony didn't change between his deposition prior to those witnesses' testimony and his actual testimony, then there is no prejudice because the testimony would have been the same. Because of this, Judge Fabiano, it's not an abuse of discretion to consider Mr. Faulkner's testimony. Judge Fabiano listened to argument from both parties on the issue, believed that the issue should have been raised earlier, yes, but also believed that there was no material prejudice to the plaintiff. And then finally, the issue of a site visit. As your Honor pointed out, this is well within the discretion of the trial court, and we're talking about four decades of life of this land. During the trial, plaintiff's counsel argued that a site visit may allow the court to see where trees had grown or where the fence was to refute some of the testimony that the Faulkners could have entered this land. The Faulkners' last ownership of the land was well back in 2005. So for the court to then go visit that land in 2023, that would not have given the judge any idea of what the Faulkners were looking at when they said they had entered the land. In addition, as to Ms. Campbell's testimony, her testimony was that she had walked on the land mainly. She had also driven a truck on the land at one point. But her testimony of entering the land was that she had walked on the land and that in terms of seeing trees or fences blocking the property, I do not believe that impact would have been the same as to someone walking on the property. Counsel's arguments related mainly to machinery being driven onto the property, and the testimony as to that was well before Judge Fabiano would have visited the property. So it was well within her discretion to say she would rely on the records, the testimony, and the property documents she was given rather than going to do a site visit on the property. Finally, I wanted to just touch on counsel's assertion that the incident with Mr. Schmidt, being advised not to take down a fence on the property, was a continuation of this hostile and adverse use of the property. That is, in fact, not the case. The testimony we have from Mr. Sorg that he asked Mr. Schmidt, a predecessor to Ms. Campbell, to restore a fence that Mr. Schmidt was taking down is really the first testimony we have in the record where a predecessor of Ms. Ulmer actually exerted some type of property interest over that property that did not include the Faulkners or the individuals who had the property after the Faulkners. And that was in 2008. So we don't have our 20 years. It's not a continuance. As well as the gate going up, that was in 2017. So again, not within our 20 years. So the final conclusion Judge Fabiano correctly made was that where we do see anything that's adverse or exclusive, Ms. Ulmer or the predecessors asserting those things, that did not occur within the necessary 20-year period. And we just simply don't have 20 years of adverse possession here. I think that's all I have for now. Thank you very much. We ask that you affirm Judge Fabiano's decision in totality and find that Ms. Ulmer did not show the elements of adverse possession here. Thank you. All right, thank you. Counsel, rebuttal argument? Thank you, Your Honors. Just a couple of notes. The first one is that counsel's argument ignores constructive notice. That is, the idea that notice does not have to be, I'm handing you a certified letter, I'm serving you with papers. It just means would a reasonable person have discovered the actions of the person claiming the adverse possession. Again, I go to the gas line as our earliest mention of that. But, Your Honors, my clients and their predecessors and titles have continuously maintained the land. That's putting down gravel, doing the snow shoveling. I would direct you to the Brand Horse case, which we cited and rely upon in our brief, which also deals with a driveway. And in particular, this is from Schmidt v. Brown, which is cited by the court in Brand Horse, which stated that the use of the road in question was adverse, uninterrupted, continuous, and exclusive. And under a claim of right, the fact that other persons also use the roadway does not prevent the claimant's use from being exclusive. So, again, they're saying, well, the argument that I've been hearing is that, well, yes, exclusivity doesn't mean that you have to exclude people, but you have to exclude people. My clients have done that in the past, and their predecessors have as well. And the final thing is that it's not just about, well, it is. It's about taking control of the land, acts of dominion. And that's what it is. Again, I disagree respectfully with counsel's assertion that putting up the gate or this was the first moment of hostility. Hostile does not mean I'm actually confronting you and being angry about it. All of it is enigmatic. All of it is wiggly-wobbly, timey-wimey, if you're a Dr. Who fan, about the fact that did they exercise dominion as a title holder would. My clients and their predecessors did in this case. And the findings by the trial court were against the manifest way of the evidence. I don't need any more time unless you have other questions for me, Your Honors. I don't see any other questions. Thank you, counsel. Thank you both. The case will be taken under advisement. The court will issue a written decision. The court stands in recess.